1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

```
UNITED STATES OF AMERICA      .    Criminal No. 1:12cr38-1
                              .
     vs.                      .    Alexandria, Virginia
                              .    February 13, 2012
KURAYE TAMUNOIBI AKUIYIBO,    .    2:03 p.m.
                              .
          Defendant.          .
                              .
 .   .   .   .   .   .   .   .   .   .
```

TRANSCRIPT OF DETENTION HEARING
BEFORE THE HONORABLE T. RAWLES JONES, JR.
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

FOR THE GOVERNMENT:              KIMBERLY R. PEDERSEN, AUSA
                                 United States Attorney's Office
                                 2100 Jamieson Avenue
                                 Alexandria, VA 22314


FOR THE DEFENDANT:               PAT M. WOODWARD, JR., ESQ.
                                 Woodward Law Group
                                 1783 Forest Drive, Suite 330
                                 Annapolis, MD 21401
                                   and
                                 KENNETH W. RAVENELL, ESQ.
                                 PAULA XINIS, ESQ.
                                 Murphy PA
                                 One South Street, Suite 2300
                                 Baltimore, MD 21202


TRANSCRIBER:                     ANNELIESE J. THOMSON, RDR, CRR
                                 U.S. District Court, Fifth Floor
                                 401 Courthouse Square
                                 Alexandria, VA 22314
                                 (703)299-8595


(Pages 1 - 47)


(Proceedings recorded by electronic sound recording, transcript
 produced by computerized transcription.)

2

I N D E X

|  | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

WITNESS ON BEHALF OF
THE GOVERNMENT:

SA David DeFilippis          4        12

3

1                            P R O C E E D I N G S

2                            (Defendant present.)

3              THE CLERK:  United States v. Kuraye Tamunoibi

4     Akuiyibo, Case No. 12cr38.

5              MS. PEDERSEN:  Good afternoon.  Kim Pedersen for the

6     United States.

7              THE COURT:  Good afternoon.

8              MR. WOODWARD:  Good morning, Your Honor.  Pat

9     Woodward, counsel for Mr. Akuiyibo.  I proffer to the Court

10    signed orders from Judge Brinkema permitting the appearance pro

11    hac vice of Mr. Ravenell and Ms. Xinis, who are present with

12    our client.

13             THE COURT:  Nice to have you with us.

14             MR. WOODWARD:  Thank you, Your Honor.

15             MR. RAVENELL:  Thank you, Your Honor.  Good

16    afternoon.

17             MR. WOODWARD:  May I defer to Mr. Ravenell?

18             THE COURT:  This matter is before the Court for a

19    bail hearing.  I have read the report that was prepared in the

20    Southern District of New York, and I have read the supplement

21    that was prepared by the Pretrial Services officer in this

22    court.  I'll consider the information in those two documents to

23    be correct unless somebody points out a problem.

24             Ms. Pedersen, does the government wish to present

25    additional evidence this afternoon?

DeFilippis - Direct                                                        4

1          MS. PEDERSEN:  We do, Your Honor.  We'd like to call

2   Case Agent David DeFilippis from the FBI.

3          THE COURT:  Okay.

4      SA DAVID DeFILIPPIS, GOVERNMENT'S WITNESS, SWORN

5                    DIRECT EXAMINATION

6   BY MS. PEDERSEN:

7   Q.    Good afternoon, Agent DeFilippis.

8   A.    Good afternoon.

9   Q.    Would you please state your full name and spell your last

10  name for the record.

11  A.    It's David DeFilippis, D-e-F-i-l-i-p-p-i-s.

12  Q.    For whom do you work?

13  A.    The FBI.

14  Q.    How long have you worked for the FBI?

15  A.    I've been a special agent for approximately ten years.

16  Q.    Where, where are you currently assigned?

17  A.    I am currently assigned to the Washington Field Office,

18  the Northern Virginia Resident Agency.

19  Q.    Do you have any training, excuse me, any training and

20  experience in financial investigations?

21  A.    I do.

22  Q.    Are you the case agent in the case of United States v.

23  Kuraye Akuiyibo, et al.?

24  A.    I am.

25  Q.    Okay.  Were you involved in the investigation leading to

DeFilippis - Direct                                                      5

1   the indictment and the arrest of the defendant in January of

2   2012?

3   A.   I was.

4   Q.   Do you see the defendant in the courtroom today?

5   A.   I do.

6   Q.   Can you identify him for the record?

7   A.   He's sitting at defense attorney between his two

8   attorneys, in green.

9           THE COURT:  He's identified the defendant.

10  BY MS. PEDERSEN:

11  Q.   During your investigation, did you obtain and review

12  financial and mortgage records belonging to the defendant?

13  A.   I did.

14  Q.   Was one of those for records -- were those records for the

15  property at 2314 First Street, N.W., in Washington, D.C.?

16  A.   That's correct.

17  Q.   What, if anything, did you learn about that property?

18  A.   Based on our review of the mortgage documents, the

19  property was purchased, I believe, in 2006 for approximately

20  680,000, fully financed.  There's two loans on the property,

21  and the current review of title records indicates the property

22  is in foreclosure.  There's a notice of default on the

23  property.

24  Q.   When was the date of the defendant's last payment for the

25  property?

DeFilippis - Direct                                                          6

1    A.    2009, I believe on the first mortgage.

2    Q.    At the time of his arrest, was the defendant residing at

3    the First Street address?

4    A.    No, he was not.

5    Q.    Where did you -- where was he living at that time?

6    A.    He was at a residence in New York.

7    Q.    Did he also have a residence in Miami?

8    A.    He did.

9    Q.    Was the First Street residence search pursuant to his

10   arrest and pursuant to a search warrant?

11   A.    Yes, it was pursuant to a search warrant.

12   Q.    What, if anything, was found during the search?

13   A.    There was a safe that was located.  Nothing was in the

14   safe.  There was an employment application that was found, and

15   there was a number of cell phones and computer laptops that

16   were seized.

17   Q.    Did you locate any passports in the First Street address

18   in Washington?

19   A.    Not at the First Street address.

20   Q.    At another location?

21   A.    That's correct.

22   Q.    Where did you locate the defendant's passports?

23   A.    At the location where Mr. Akuiyibo was arrested in New

24   York.

25   Q.    Was that location in New York also searched?

DeFilippis - Direct                                                      7

1    A.    It was.

2    Q.    What was found during that search?

3    A.    There were -- there was a safe that was located.  When the

4    safe was opened, there was approximately $5,000 in U.S.

5    currency in there as well as, I believe, six watches and an

6    appraisal for, I believe it was a Rolex for about 30,000 or

7    more.

8          Also in the residence were a couple more watches that

9    were located, a bank deposit receipt for about $150,000, some

10   corporate document filings, one I believe it was in Nigeria, a

11   little bit of other currency, other jewelry.

12   Q.    Were there any other physical items seized from the

13   residence such as telephones or anything like that?

14   A.    Yeah, telephones, over a dozen telephones and computers.

15   Q.    Did you, did you find any travel documents?

16          THE COURT:  How many telephones and how many

17   computers?

18          THE WITNESS:  Judge, I believe there was over a dozen

19   cell phones and I believe over half-a-dozen computers.

20   BY MS. PEDERSEN:

21   Q.    Did you find any travel documents?

22   A.    Yes.

23   Q.    What were the nature of the travel documents?

24   A.    To Nigeria.

25   Q.    Was there a search done of a Range Rover that was located

DeFilippis - Direct                                                          8

1    also in New York in proximity to the residence?

2    A.    Yes, there was.

3    Q.    What, if anything, was found during the search of the

4    Range Rover?

5    A.    The Range Rover had a cellular phone located in it as well

6    as some receipts for some jewelry.

7    Q.    Were there any documents in the Range Rover belonging to

8    the defendant or associated with him?

9    A.    Yes.

10   Q.    What was that?

11   A.    There was a receipt, a MetroPCS receipt -- correction.

12   There was a bank deposit receipt, I believe, that was found in

13   the, in the vehicle as well as some other documents for

14   appraisals of jewelry.

15   Q.    Were there any receipts in names other than the

16   defendant's true legal name?

17   A.    There were.

18   Q.    What item -- what document was that?

19   A.    There was a MetroPCS receipt that was found in the name of

20   another individual that came back to Mr. Akuiyibo's personal

21   cellular phone.

22   Q.    Did it also reference the D.C. address on First Street?

23   A.    It did.

24   Q.    Okay.  What is the approximate value of the watches seized

25   from the New York residence?

DeFilippis - Direct                                                                9

1    A.    Based upon appraisals and receipts that were found, they

2    were anywhere from 5,000 to 40,000 dollars each.

3    Q.    Do you know if the defendant has used or gone by any other

4    names other than the Dennis Miller?

5    A.    Yes, we do.

6    Q.    What names do you know him to have used?

7    A.    Gerald, G, Michael, A. G. McNeal, Daniel Phillips, and

8    there was another name on the MetroPCS receipt that escapes me

9    right now.

10   Q.    Okay.  Did you seize any cars pursuant to the arrest?

11   A.    We did.

12   Q.    What cars did you seize, and where were they located?

13   A.    We located an Aston Martin located in Miami, and we seized

14   a Range Rover in New York.

15   Q.    Did you have occasion to query any text records to show if

16   the defendant had made foreign travel in the years 2010 and

17   2011?

18   A.    Yes, we did.

19   Q.    What were the results of your query?

20   A.    There was a number of occasions where Mr. Akuiyibo

21   traveled outside the country late 2010 and early 2011 to places

22   like Dubai, London, Nigeria, St. Maarten's, and I believe

23   Toronto, Canada.

24   Q.    Did the FBI also obtain and review bank records belonging

25   to or used by the defendant either in his own name or in the

DeFilippis - Direct                                              10

1    name of other companies?

2    A.    We did.

3    Q.    Did you review a record from a company called Boyton LLC?

4    A.    Yes.  Myself and a financial analyst reviewed those

5    records.

6    Q.    According to the records, approximately when did the

7    defendant open a Boyton LLC account?

8    A.    I believe that was in April or May of 2001.

9    Q.    Do the records reveal any cash deposits coming into the

10   Boyton LLC account in 2011?

11   A.    Yes, they do.

12   Q.    Did you see any activity -- well, let me ask you this:

13   What were the amounts per month of the cash deposits coming

14   into that account beginning in May of 2011?

15   A.    They varied anywhere from 20 to 30,000 per month, and then

16   the last month I think we had was about 6,000, but they were on

17   average 20 to 30,000.

18   Q.    Did you see any activity in that account or any

19   transactions involving the purchase and sale of automobiles?

20   A.    No, we did not.

21   Q.    What about a personal account held in his name?  Did you

22   have occasion to review records from Bank of America for that

23   account?

24   A.    We did.

25   Q.    What were -- what was the nature of the activity in his

1    personal accounts?

2    A.    Small deposits, a couple thousand at a time.

3    Q.    And again, any activity indicative of auto sales,

4    purchasing or selling autos?

5    A.    No.

6    Q.    During the searches, did you seize any records or

7    documents indicative of purchasing cars at auction for resale?

8    A.    No.

9    Q.    Did the investigation reveal the defendant to have engaged

10   in acts of violence and threats of violence at different times?

11   A.    Yes.

12   Q.    How many different witnesses did you have occasion to

13   interview during the investigation who stated that the

14   defendant had threatened violence or assault to them with a

15   firearm?

16   A.    Three.

17   Q.    Okay.  And of the three that you interviewed, who

18   indicated that they had been assaulted by a firearm by the

19   defendant, or how many?

20   A.    Two.

21   Q.    And were two of those individuals employees of Classy DC

22   Escorts?

23   A.    Yes, they were.

24   Q.    And did any of them report these events to police

25   contemporaneous with the events taking place?

1    A.    One did.

2    Q.    Were the two incidents involving the firearms charged in

3    the indictment?

4    A.    Yes, they were.

5    Q.    Okay.  And did you recover any firearms during any of the

6    searches either of any of the residences or cars in this case?

7    A.    No.  No, we did not.

8            MS. PEDERSEN:  Okay.  I have nothing further of the

9    witness at this time.

10                          CROSS-EXAMINATION

11    BY MR. RAVENELL:

12    Q.    Good afternoon, Agent.

13    A.    Good afternoon.

14    Q.    You and I just met briefly.  DeFilippis?

15    A.    "DeFilippis."

16    Q.    "DeFilippis," thank you.

17            Why don't we kind of stop where -- where Madam

18    Prosecutor just stopped, let's pick up there on a couple of

19    things.  You mentioned to the Court that there was a MetroPCS

20    receipt; is that correct?

21    A.    That's correct.

22    Q.    And that was found in the Land Rover?

23    A.    I believe it was found in the Land Rover or the house.  I

24    can't recall at this point.

25    Q.    Okay.  So when you said earlier that it was the Land

DeFilippis - Cross                                                   13

1    Rover, that could have been, been a mistake?

2    A.   It was either found in the Land Rover or the house.

3    Q.   Okay.  All right.  So -- and the item that was found was

4    what again?

5    A.   It was a receipt, MetroPCS receipt that had the name of an

6    individual with the 2314 First Street, N.W., address, with

7    Mr. Akuiyibo's personal cell phone on it.

8    Q.   Okay.  And did it have a photograph of Mr. Akuiyibo?

9    A.   No.

10   Q.   Okay.  So if I understand it --

11            THE COURT:  Let me interrupt for a second.  Would

12   somebody tell me what MetroPCS is?

13            MR. RAVENELL:  I was going to ask that one, Judge,

14   because --

15            THE COURT:  I'm not familiar with it.

16            MR. RAVENELL:  I was headed right there.

17   Q.   What is a MetroPCS receipt?

18   A.   MetroPCS is a cellular phone company.

19   Q.   Okay.  So this is a cell phone receipt, and that has a

20   phone number on it?  Is that what you said?

21   A.   It had a phone number, yes, Mr. Akuiyibo's cellular phone.

22   Q.   And you had investigated this case for how long, I'm

23   sorry?

24   A.   We investigated, the FBI, since April 2011.

25   Q.   Okay.  And the name that you saw on the MetroPCS receipt,

DeFilippis - Cross                                                    14

1    now we know what it is, had you seen or heard that name prior

2    to seeing it on this receipt?

3    A.    No.

4    Q.    Okay.  During the -- there was a wiretap in place,

5    correct?

6    A.    That's correct.

7    Q.    For about 60 days or so?

8    A.    That's, yeah, about 60 days.

9    Q.    Okay.  And there were recorded conversations of my client?

10   A.    As well as text messages.

11   Q.    Okay.  And did he ever use that name that appeared on the

12   MetroPCS?

13   A.    No.

14   Q.    All right.  And you mentioned a couple other names:

15   Gerald, a Michael, or A. G. McNeal, I think you said, and

16   Daniel?

17   A.    That's correct.

18   Q.    All right.  And you told the Court that Mr. Akuiyibo used

19   those names.  When and how did he use the names?

20   A.    G or Gerald is the name that he went by with most of the

21   prostitutes that he met with as well as employees of the Classy

22   escort business.  Michael was a named based upon a wiretap that

23   we picked up that he used when he was taking photos of the

24   girls in hotels.  He would typically use that as his name, as

25   opposed to using his real name.

DeFilippis - Cross                                                    15

1              A.  G. McNeal was a name he was using on an e-mail

2       account to talk to a couple of the witnesses, one that's named

3       in the indictment, to communicate travel lodging information.

4       Daniel Phillips, that was a name that was used, I believe, on a

5       Boost prepaid mobile that we had on the wiretap.  That was one

6       of our target telephones.

7       Q.    Okay.  So take out the last name for a moment.  All of the

8       other names you mentioned were names that were used in this

9       business that you're talking about; is that correct?

10      A.    That's correct.

11      Q.    Okay.  Not names that were used on any driver's license or

12      passport, anything of that nature?

13      A.    Not that I'm aware of.

14      Q.    Okay.  And you did an investigation to see whether he used

15      names on any other passports, driver's license, correct?

16      A.    That's correct.

17      Q.    All right.  And then the last name you mentioned was used

18      was again on a receipt or something?

19      A.    No.  That was subscriber information on a Boost prepaid

20      mobile phone.

21      Q.    Okay.  Cell phone.

22      A.    Correct.

23      Q.    All right.  So again, that name was not used on any

24      official government document, (inaudible) document, or

25      fraudulent documents that you saw?

DeFilippis - Cross                                                      16

1   A.   Not that I'm aware of, but it was used for that phone.

2   Q.   Right, I understand.  Let me make sure -- I'm not trying

3   to trick you; I'm trying to make a distinction.  I'm not

4   talking about a phone, but I'm talking about driver's license,

5   passports, things of that nature.  Was that name used on any

6   such document to your knowledge during your however many months

7   of investigation?

8   A.   No, it was not.

9   Q.   Okay.  Now, you indicated that Mr. Akuiyibo traveled to

10  Dubai, London, Nigeria, St. Maarten.  Did I miss anything,

11  anyplace?

12  A.   I believe there was maybe Toronto.

13  Q.   Toronto.

14       Were there any restrictions on his travel when he was

15  going to those locations?

16  A.   No.

17  Q.   Okay.  No one had told him that he was under investigation

18  as far as you knew and that he should stay in the country or

19  anything like that?

20  A.   No.

21  Q.   Okay.  And when were the -- when did the travels occur?

22  A.   I think the Dubai one was late 2010 into 2011, and then

23  the others followed at some point in 2011, with the most

24  current -- I believe the Nigeria trip was in October, and then

25  there was a trip in December to I believe it was London.

DeFilippis - Cross                                                    17

1    Q.    Okay.  Do you know whether he has any relatives in

2    Nigeria?

3    A.    I understand from witnesses he does.

4    Q.    Okay.  And for example, his mother and other members of

5    his family?

6    A.    We've been told that his mother lives there.  We've also

7    been told he has other family over there.

8    Q.    Okay.  All right.  And do you know from any information

9    whether he visited his mother when he went to Nigeria?

10   A.    A witness who we spoke to said that when they traveled

11   there with Mr. Akuiyibo, his other family members were there,

12   to include his mother.

13   Q.    Okay.  So he visited other family members, including his

14   mother, when he went to Nigeria?

15   A.    That's my understanding.

16   Q.    Okay.  And you know that he has a sister that lives in

17   London?

18   A.    I've learned that recently.

19   Q.    Do you know whether when he visited London, whether he met

20   and visited his sister?

21   A.    I do not.

22   Q.    Okay.  Now, St. Maarten is kind of a popular place for

23   vacation for people to get away from the cold a little bit,

24   right?

25   A.    True.

DeFilippis - Cross                                              18

1   Q.   And Dubai, I think, is actually one of the more popular

2   places now for travel for vacation as well.

3   A.   I haven't been there.  I couldn't tell you.

4   Q.   I haven't been there, either, but I would like to go

5   there.  So one day I hope to get there.

6            Now, you've mentioned a Boyton LLC records review.

7   Tell me what records are those that you reviewed, what you

8   gathered and reviewed.

9   A.   Financial records, mostly bank statements.

10  Q.   So just bank statements showing money in and money out, so

11  to speak?

12  A.   Yes, and the detail related to those.

13  Q.   Okay.  So what were the details that you looked at related

14  to the money in, money out?

15  A.   Expenditures, airlines, hotels, various other charges.

16  Q.   Okay.  And what did you see as the expenditures on the

17  Boyton LLC transaction?

18  A.   We saw expenditures to Priceline, places like that, to

19  book hotel and travel stays.  Those were mostly airline and

20  hotel expenditures as well as personal expenditures.

21  Q.   Okay.  Now, you, you showed cash coming out of the account

22  as well?

23  A.   No, cash coming into the account.

24  Q.   Did you ever see any cash coming out of the account?

25  A.   I can't recall if there was large amounts of cash that

DeFilippis - Cross                                                      19

1    were withdrawn from the account.

2    Q.    I didn't ask you about large amounts, but just in general,

3    did you see --

4    A.    Just in general, I don't recall if there were actually a

5    lot of money coming out of the account via cash withdrawal.

6    Q.    But you saw cash going into the account?

7    A.    Yes.

8    Q.    Okay.  I think 20 to 30,000 a month, is that correct?

9    A.    That's correct.

10   Q.    Now, you were asked a question whether you saw any

11   activity regarding purchases of vehicles.  If someone bought a

12   vehicle and received cash for it and deposited the cash into

13   the account, you wouldn't know the source of the cash that went

14   into the account?

15   A.    If cash was deposited into the account, we would, we would

16   get from the bank the detail that would just show cash being

17   put into the account.

18   Q.    Correct.  So if I had bought a vehicle for $10,000 and

19   sold it, you know, for $15,000 and put -- in cash and put the

20   cash into the account, the bank account wouldn't show what the

21   source of the cash was that went in?

22   A.    That's correct.  It's usually the entire transaction on

23   both sides in cash, you would only see cash coming into the

24   account.

25   Q.    All right, okay.  You indicated that there were three

DeFilippis - Cross                                              20

1    individuals who mentioned that there was threats of violence;

2    is that correct?

3    A.   That's correct.

4    Q.   And then one reported it to the police on a

5    contemporaneous basis; is that correct?

6    A.   That's correct.

7    Q.   And you were asked whether those incidents were related or

8    in the indictment, and you said that's correct, that it was

9    actually -- those incidents are in the indictment?

10   A.   Those two incidents, yes.

11   Q.   Two incidents, right.  The two incidents that were alleged

12   threat of a weapon -- use of a weapon.

13   A.   That's correct.

14   Q.   Okay.  Now, the -- I'm looking at the indictment, and

15   there's Count 3 -- the indictment, do you have a copy there?

16   A.   I don't have it in front of me.

17        MR. RAVENELL:  Okay.  May I approach the witness,

18   Your Honor?

19        THE COURT:  No.  He can have my copy.

20        MR. RAVENELL:  Okay.  Great.  Thank you, Judge.

21   Q.   Now, Count 3 of the indictment indicates an incident

22   happened in September of 2009?

23   A.   That's correct.

24   Q.   All right.  And was that the incident that was or was not

25   reported to the police contemporaneously?

DeFilippis - Cross                                                          21

1   A.    That's the incident that was reported to the police.

2   Q.    Okay.  And was my client's name given to the police at the

3   time as a person who had committed the acts set forth in Count

4   3?

5   A.    Not at the time it was not.

6   Q.    When was his name given to the police as the person who

7   committed the act?

8   A.    I believe it was a few months later, after some further

9   investigation was conducted.

10  Q.    So it was sometime near the end of 2009?

11  A.    Maybe within a month.  That's -- yeah.

12  Q.    Okay.  September-October, thereabouts?

13  A.    Yes.

14  Q.    All right.  And then there are a couple other incidents in

15  Counts 5 and 6, and maybe you can help me out with this,

16  because I'm looking at Counts 5 and 6, and they seem to be an

17  identical statement.  Is this one incident or two incidents,

18  Counts 5 and 6?  Everything seems to be identical.

19  A.    The September 2010 incident was the same incident.

20  Q.    So this is charged twice for the same incident?

21  A.    I think that's a legal question, sir.

22  Q.    I'm not trying to get a legal, but I'm just trying to make

23  sure -- believe me, I'm not trying to get you to answer the,

24  why the prosecutors did it.  I'm just trying to make sure I

25  understand that 5 and 6, were there two charges for assault and

1    dangerous weapon is the same incident?

2    A.    That's correct.

3    Q.    Okay.  And the same, same alleged victim?  Same alleged

4    victim?

5    A.    For that incident, that's correct.

6    Q.    Okay.  All right.

7             And in the incident on September 2010, the person who

8    was allegedly assaulted was a male?

9    A.    That's correct.

10   Q.    Okay.  And would you describe the -- do you know the male?

11   A.    I do.

12   Q.    How big is the male? height? size?

13            MS. PEDERSEN:  I object as to relevance.

14            THE COURT:  Overruled on that question.

15            THE WITNESS:  The individual, size and weight, I'd

16   say he's probably about five-nine, probably close to 200

17   pounds.

18   BY MR. RAVENELL:

19   Q.    Okay.  How tall would you say my client is?

20            MS. PEDERSEN:  Objection.

21            THE COURT:  I see where he's going.  The objection is

22   overruled.

23            THE WITNESS:  He's about six foot.

24   BY MR. RAVENELL:

25   Q.    All right.  And how much would you say he weighs?

DeFilippis - Cross                                                     23

1    A.    180.

2    Q.    Okay.  Now, the person in -- who is in Count 5 and 6, did

3    he tell you that when this alleged assault started out, it was

4    a, kind of a fistfight?  My client hit him with a fist?

5    A.    Yes.  He said the fight started with your client punching

6    him; that's correct.

7    Q.    All right.  And did he tell you how many times he punched

8    my client?

9    A.    Say again?

10   Q.    Did he tell you how many times he punched my client?

11   A.    He said he did not fight back.

12   Q.    He just didn't fight back at all.

13   A.    He did not fight back at all.

14   Q.    Okay.  Now, you mentioned kind of vaguely that there was a

15   threat of a gun.  Did my client allegedly pull a weapon and

16   threaten to use it against this person on September 10 --

17   September, yeah, 2010?

18   A.    Not the September 2010.  The other, the other incident.

19   Q.    Okay.  So -- focus on where I am, please.  September 2010,

20   this incident you described to the Court, my client is never

21   alleged to have pulled a weapon out and pointed it at this

22   person and threatened to use it; is that correct?

23   A.    He didn't point it at him; that's correct.

24   Q.    And never threatened to use it, is that correct?

25   A.    He didn't say --

DeFilippis - Cross                                                     24

1   Q.    He never said, "I'm going to do something with this

2   weapon," correct?

3   A.    He did not; that's correct.

4   Q.    And he never pointed it at the person, correct?

5   A.    Right.

6   Q.    All right.  Now, you were asked by the Court whether --

7   I'm sorry, by Madam Prosecutor whether any weapons were

8   recovered, and you said no.  Is that right?

9   A.    That's correct.

10  Q.    When you searched the, one of the codefendants' home,

11  Mr. Asuen, did you recover a pellet gun?

12  A.    Yes.

13  Q.    All right.  Did you ask the person who was described in

14  Counts 5 and 6 whether -- well, back up.  Had the person who is

15  described in 5 and 6 ever presented any kind of a replica gun

16  to you to show what this gun allegedly looked like that he said

17  was in my client's possession on -- in September 2010?

18  A.    Yes.  I had asked him to provide a photo of a similar

19  weapon, and he did provide that.

20  Q.    Okay.  And the photo of a similar weapon, when you

21  recovered the -- do you have a copy of that?

22  A.    I don't.

23  Q.    You don't have a photograph of it here today?

24  A.    No.

25  Q.    Okay.  That's fine.

DeFilippis - Cross                                              25

1              When you recovered the pellet gun from Mr. Asuen's

2    home, did you compare it to the photograph that you had gotten

3    from the person in Counts 5 and 6?

4    A.    I did.

5    Q.    Did it appear to be similar?

6    A.    It did.

7    Q.    Did it look like it could have been that pellet gun?

8    A.    It was possible.

9    Q.    All right.  The Court's indulgence, Your Honor?

10             When did you first interview, or you or any law

11   enforcement person first interview the person who's the alleged

12   victim in Counts 5 and 6?

13   A.    That individual was interviewed by Montgomery County, I

14   believe, as early as January of that year, and then the FBI got

15   involved in April, and that was our first contact with that

16   individual.

17   Q.    So the incident happened in September 2010.  The person

18   was interviewed January 2011?

19   A.    That's correct.

20   Q.    And then you guys interviewed him again in April 2011?

21   A.    We started, yes.

22   Q.    Okay.  And did you know my client's whereabouts from after

23   you started this investigation?  Did you check on his

24   whereabouts, see where he was, where he was located?

25   A.    Yes, we did.

DeFilippis - Cross                                                    26

1    Q.   All right.  Were any efforts made to arrest him after you

2    had been told about the alleged violence that occurred in 2010,

3    September 2010?

4    A.   No.

5    Q.   All right.  How many people -- you were asked about

6    individuals that you interviewed who may have said that there

7    were some threats of violence or weapon, and you said three.

8    How many people did you interview in total in your

9    investigation?

10   A.   In addition to those three, I'd say maybe another six.

11   Q.   Okay.  So about nine total?

12   A.   If I had to, you know, if I had to put a number on it

13   right now.

14   Q.   All right.  Now, you went to -- I'm going to jump ahead

15   and come back, but when you went to -- were you involved in the

16   arrest of my client in New York?

17   A.   I was.

18   Q.   All right.  And when -- you made an effort to arrest him,

19   and he did not resist?

20   A.   That's correct.

21   Q.   Okay.  Court's indulgence, Your Honor?

22        Now, the location where you arrested my client in New

23   York, that is the residence in the name of his girlfriend, is

24   that correct, or fiancee?

25   A.   At the time, I believe that was -- he had, he had recently

DeFilippis - Cross                                                    27

1   moved, and the agents in New York determined that was where he

2   was currently staying.  I'm not sure if his girlfriend was

3   actually on the lease to that, that place at that time.

4   Q.   It was actually in her name, wasn't it?

5   A.   I don't know that.  I'm assuming it was.

6   Q.   Okay.  Now, was she present when, when he was arrested?

7   A.   Yes.

8   Q.   In fact, she was arrested as well?

9   A.   Yes, she was.

10  Q.   Okay.  And the Range Rover that you told the Court about

11  was actually a Range Rover in his girlfriend's name as well?

12  A.   That's correct.

13  Q.   Okay.  And she's a physician?

14  A.   Yes.

15          MR. RAVENELL:  All right.  No further questions, Your

16  Honor.

17          THE COURT:  I want to go back to the searches for a

18  moment.  The government lawyer asked you about passports,

19  plural, if I heard correctly, and you said passports in plural

20  had been seized.  I'd like to know how many passports and in

21  what names.

22          THE WITNESS:  Judge, there was a U.S. passport in

23  Mr. Akuiyibo's name that was seized, and there was also a

24  Nigerian passport as well in his name that was seized.

25          THE COURT:  Any redirect or any questions based on

DeFilippis - Cross                                                    28

1    the Court's questions?

2            MS. PEDERSEN:  Not from the government, Your Honor.

3            MR. RAVENELL:  I do have one, Your Honor.

4    Q.   Did you know that Mr. Akuiyibo actually has dual

5    citizenship, the U.S. and Nigeria?

6    A.   I didn't know that.

7    Q.   You did not know that?

8    A.   I did not.

9            MR. RAVENELL:  Okay.

10           THE COURT:  The witness may step down.

11                          (Witness excused.)

12           THE COURT:  Does the government have additional

13   evidence?

14           MS. PEDERSEN:  No, Your Honor, it does not.

15           THE COURT:  All right.  Mr. Ravenell, do you have

16   evidence by proffer or witness?

17           MR. RAVENELL:  No, Your Honor.  We'll just have

18   argument.

19           THE COURT:  All right, I'll hear from the government

20   first.

21           MS. PEDERSEN:  Your Honor, this case, the government

22   contends the defendant is both a risk of flight and a danger to

23   the community.  The factors to be considered under 18 U.S.C.

24   3142 include the nature and the circumstance of the offenses

25   charged.  In this case, the defendant has been charged as being

29

1    the owner and operator of an extensive criminal enterprise who

2    employed multiple individuals, most of whom have been charged

3    in the indictment along with him.

4            The racketeering activity outlined in the indictment

5    goes from 2009 through January of 2012.  The defendant has been

6    charged with laundering over $4 million in cash, which was the

7    proceeds of a prostitution enterprise.  The guidelines alone

8    for the money laundering count are approximately 151 months, or

9    12-1/2 years.

10           The defendant has been charged with two -- with

11   numerous acts involving violence in two counts of 924(c), two

12   separate victims, on two separate dates, at two separate

13   locations.  If convicted on both of those 924(c) counts, he's

14   facing five years on the first count and a consecutive 25 years

15   on the second count, which would be consecutive to the count --

16   to the money laundering count.

17           The weight of the evidence in this case include

18   wiretap of the defendant's phone and other phones of members of

19   the conspiracy, intercepts of conversations and text messages.

20   There are bank records, surveillance photos, a confidential

21   human source and other cooperating witnesses who are

22   prostitutes or employees of the business.

23           The government has seized cash, assets, and other

24   physical items during the arrest and execution of the search

25   warrants.

30

1          The history and characteristics of this defendant

2    include an individual who has used other names to conceal his

3    identity through the operation of an extensive criminal

4    enterprise.  The defendant himself has made inconsistent

5    statements regarding both the nature, the duration -- and

6    duration of his employment and his residence.

7          There's no evidence that the defendant has any

8    legitimate income or has had any during the course of the time

9    period charged in the indictment.  The defendant has not paid

10   mortgage on the D.C. property on First Street since January --

11   I'm sorry, February of 2009.  He has no equity in that

12   property.

13         He doesn't have any family, residential, or

14   employment ties to the Eastern District of Virginia.  He's had

15   residences in New York and Miami up until the time of his

16   arrest.  He has business ties to Nigeria and his mother and

17   other family members in Nigeria.

18         The defendant has failed to disclose through Pretrial

19   recent travel to Toronto, Canada; Nigeria; and Dubai in 2011.

20   Even though he reported travel to London, Paris, and some other

21   location that escapes me, he didn't disclose those travel to

22   Pretrial.

23         There's evidence that he's made large financial

24   deposits, and again, use of alias or other names to conceal his

25   identity.

1          The nature and seriousness of the danger to the

2     community of the defendant is that the grand jury has found

3     probable cause that the defendant has committed acts of

4     violence with a firearm on two separate victims at two

5     separate, at two separate times.

6          This is a presumption case which involves violence

7     and the possession or use of a firearm or other dangerous

8     weapon.  There's no condition or combination of conditions

9     which will reasonably assure the appearance of this defendant

10    or the safety of the community.  The release of the defendant

11    to a third party does nothing to guarantee that the defendant

12    will reappear at court.  There is nothing in this district or

13    even this area to keep the defendant from failing to appear and

14    no motivation at all for a third party to prevent his flight or

15    to ensure his appearance.

16         The government has not recovered anywhere close to

17    nearly the $4 million worth of assets that he laundered during

18    the conspiracy or any firearm, and if convicted, the defendant

19    faces extremely significant time in federal prison.

20         The defendant was detained in New York at his

21    detention hearing, and the defense has presented no new

22    information that would justify his release.

23         Just to point out to the Court, one other

24    codefendant --

25         THE COURT:  Did the defendant have a bail hearing in

32

1    New York?

2           MS. PEDERSEN:  He did have a bail hearing, Your

3    Honor.

4           The codefendant, Mr. Asuen, who is not the owner or

5    operator of Classy, was detained by Judge Buchanan last week as

6    a risk of flight and a danger to the community, and Mr. --

7           THE COURT:  Well, that's irrelevant.

8           MS. PEDERSEN:  Just for comparison purposes, Your

9    Honor.

10          THE COURT:  It's still irrelevant.

11          MS. PEDERSEN:  The point of the argument is that the

12   defendant can't rebut his statutory presumption, and he should

13   be detained in this case.

14          THE COURT:  All right, thank you.

15          Mr. Ravenell?

16          MR. RAVENELL:  Thank you, Your Honor.  Your Honor,

17   let me start with a couple of things that the government said

18   and then kind of work back to things that I had planned to say

19   to you originally.  The government says that my client is a

20   risk of flight because he did not report all of his travels out

21   of the country, Judge.  He reported different locations he went

22   out of the country.

23          Now, the suggestion that because he according to the

24   government didn't say each and every place he went, that that

25   suggests that he's a risk of flight, by saying he went to

1    London, saying he went to other places, saying he went to

2    Nigeria, to disclose that information certainly makes sense

3    that he's trying to hide that he went to vacation spots as

4    well.

5              The fact that he's upside down on his mortgage,

6    Judge, he should be therefore welcomed to many other

7    individuals in society who are facing those difficult problems

8    of being --

9              THE COURT:  I'm more concerned about the fact that he

10    told the Pretrial Services officers that that's where he lived

11    when clearly he didn't.

12             MR. RAVENELL:  Your Honor, I would say to the Court

13    that as to where he lived, his address -- the only address that

14    he has that is in his name is the address in Washington, D.C.

15    As you can see even when his brother spoke to Pretrial today,

16    it made it clear that he was living with his girlfriend.

17             Now, I think there's clearly just a misunderstanding

18    about where he lived, because he says his address is, is in

19    D.C.  That is the only one that's in his name.  The other

20    addresses in New York and the address in Miami are both in his

21    fiancee's name, and that is the information that he was

22    conveying.

23             I do not believe, Judge, that he was trying to convey

24    that he really wasn't living in New York when, in fact, he was

25    clearly there when the police arrested him, he had most of the

34

1    information there.

2            Now, obviously, we did not sit down with him when he

3    spoke to Pretrial in New York, and quite frankly, I think that

4    is at best a misunderstanding of what was being conveyed.  Many

5    people say that my permanent address is the one that I actually

6    have as my home, and it's still his home.  The fact that he's

7    upside down on the mortgage, Judge, it is still his address,

8    and it's still his home.

9            THE COURT:  All right.

10           MR. RAVENELL:  All right.  I'm going to address, Your

11   Honor, other matters.  Certainly Pretrial has made a

12   recommendation here that our client can be released on

13   conditions as well as Pretrial in New York, and I'll point out

14   that as in the pretrial report indicates that when the hearing

15   was held in New York, Judge, that it was a detention, because

16   the Court understood he would be facing, having a full

17   detention hearing here, and that's what I -- I'm going to find

18   where the location was that I read earlier when I was reviewing

19   the report.  Pretrial indicated that the Court was aware he

20   would have an additional hearing when he came to this location.

21           THE COURT:  All right.

22           MR. RAVENELL:  And in fact, it says it in

23   paragraph -- current status, the defendant was at his initial

24   appearance, Magistrate Judge Michael Dolinger, and was detained

25   pending removal to this district.

1          Your Honor, I, too, will start with the standards the

2   Court must consider, and certainly this Court has to consider

3   whether there are any conditions or combination of conditions

4   that will reasonably assure that my client will appear for

5   court and not present a danger to the community.

6          Obviously, it's not that we can say that, 100 percent

7   that he will not fail to appear, but what's going to be,

8   reasonably assure that he's going to appear, and this Court has

9   obviously dealt with this many times.  I'm not trying to preach

10  to the choir by giving the Court the standards, but it kind of

11  helps to set it up and then go through the factors that I think

12  the Court certainly is required to look at and that I have

13  considered in what I want to present to the Court.

14         When we look at those factors, Judge, the factors are

15  whether there -- look at the nature and circumstance of the

16  offenses and decide on whether there he's a danger if released

17  on conditions and whether he's a risk of flight.

18         THE COURT:  I'm primarily concerned with flight risk.

19         MR. RAVENELL:  And I will address that, Your Honor.

20         Let me jump ahead, Your Honor, to what we propose as

21  our conditions to assure that he is going to appear and then,

22  in fact, tell the Court why I think these are the reasons that

23  the Court can be satisfied.  Let me back up to why he's not a

24  flight risk in our opinion.

25         Judge, he is a U.S. citizen.  He has dual citizenship

1    both here and Nigeria.  His brother, who is -- both his

2    brothers are present, but his brother Ekine Akuiyibo, Judge, is

3    present with his wife.  I ask him to stand, please.

4             He's the older brother.  He flew in from San

5    Francisco as soon as he was aware that his brother was charged

6    in these matters to get involved and to assist him.  He is a,

7    just as my client, is a graduate from George Mason University,

8    and others of his family graduated from George Mason.  My

9    client's brother is a graduate, also, from Stanford University.

10   He works there.

11            He is here because he wanted to make sure that his

12   brother was going to get not just good representation and

13   actually made efforts to bring us in to represent his brother,

14   but also that he was going to assist as a surrogate third-party

15   custodian.  We know he's in California.

16            What else, Judge?  Why is he not a flight risk?  A

17   couple of things.  Before he was arrested, there was a parking

18   attendant at the building that they were moving from.  They

19   were moving from one location to the next.  The parking

20   attendant told my client that he was aware that the FBI had

21   been around asking questions about him.  My client therefore

22   knew the FBI had been asking questions about him.  He didn't

23   flee the jurisdiction.

24            On the day of his arrest, before the police arrived

25   at his home, he received a call indicating that several of his

37

1    codefendants had been arrested.  Again, he did not flee.

2            THE COURT:  All right, Mr. Ravenell, I've got to hold

3    you to the same standard I hold the government to on this.

4            MR. RAVENELL:  Sure.

5            THE COURT:  I mean, you're in effect proffering now,

6    and the government's not going to have a chance to

7    cross-examine the information that, that you're providing to

8    the Court.

9            MR. RAVENELL:  I understand that, Judge, but even if

10    I presented it as a proffer, they wouldn't have a chance to

11    cross-examine it.

12            THE COURT:  Well, they could call him -- call

13    additional witnesses.

14            MR. RAVENELL:  Well, Your Honor, I'm certainly not

15    opposed to them doing that --

16            THE COURT:  Wait a minute.

17            MR. RAVENELL:  I'm sorry.

18            THE COURT:  Go ahead.

19            MR. RAVENELL:  Additionally, Your Honor, when the

20    police officers arrived at his door, he saw them coming, and he

21    did not flee the jurisdiction or attempt to flee the door --

22    leave out of the location.  In fact, he opened the door.  He

23    saw them coming with a battering ram.  He didn't want the door

24    broken in.  He opened the door, Judge.

25            This man didn't do anything to try to go out the back

 1  door, so to speak, Judge.  He just waited there.  He knew about

 2  it in advance, several hours in advance, and he knew about it,

 3  that they were looking at him at least a couple of days in

 4  advance.

 5          Now, here's what we suggest, Your Honor, would be

 6  conditions to make sure that he is going to appear before this

 7  Court:  We have a third-party custodian, Mr. Rukevbe Esi.  He's

 8  present here, Judge.  I ask him to stand.

 9          He has been interviewed by Pretrial, and certainly

10  he's here for the Court to query him and for the Court to ask

11  any -- I'm sorry, do you want to --

12          THE COURT:  I was just inviting him to have a seat.

13          MR. RAVENELL:  Thank you.

14          That he's been queried by Pretrial, Judge, and we

15  queried him as well, because we understood the importance of

16  presenting someone who would be a legitimate, sound, stable

17  person as the third-party custodian that the Court could trust

18  is not going to have my client in his home and violating any of

19  the Court's conditions, and if he were to leave the home, to

20  alert the Court.

21          He is a long-time resident of this area.  He also

22  attended, Mr. Esi, George Mason.  He is a long-time family

23  friend.  He also, friends from Nigeria and their families are

24  both from Nigeria.

25          He once he graduated from George Mason began to work,

1    Judge.  He worked for five years at FedBid, an IT there.  He

2    then left for three years, worked at another location, went

3    back and is there again.  Married with two children.  His wife

4    is expecting.

5         He has welcomed our client into his home.  He

6    regularly attends church at the Grace Covenant -- Grace

7    Covenant Church, and he's 34 years old, about to be 35 in about

8    a week or so.

9         So with him in the home, his wife in the home keeping

10    an eye on our client, Judge, added to that, we suggest the

11    Court consider electronic monitoring.  Pretrial has not

12    suggested electronic monitoring, but because the Court has a

13    concern of flight risk, we suggest the Court add the condition

14    of electronic monitoring, which we understand has GPS

15    capability.  So if he is out of the house, Judge -- and again,

16    I'm not preaching to the choir; you know how it works with

17    GPS -- they're going to know that he's left the house, Judge.

18         I'll add something else to this package, Judge:

19    We're so sure that he is not going to flee this jurisdiction

20    and not appear for court that we have four pieces of property

21    from individuals who are willing to post their homes, and my

22    client and those people know how important it is and that if he

23    leaves, they lose their homes.

24         Judge, we have property, Mr. Ekine Akuiyibo and his

25    wife post their property at 516 Diamond Street in San

40

1    Francisco.  Mr. Akuiyibo's aunt -- and I'm going to mess this

2    name up -- Ms. Ibiteyin Myers, who lives in Missouri City,

3    Texas, will place her home.  Mr. Esi, who will be serving as

4    third-party custodian, would also post his home; and there's

5    another home in Atlanta, Georgia, that the Ojanugas are willing

6    to post.  There are four pieces of property, Judge, that they

7    are willing to put up.

8            I think, Your Honor, when you consider the property

9    package, consider electronic monitoring with 24-hour lockdown

10   except for to visit, obviously, counsel and Pretrial and for

11   doctor visits if necessary, that the Court can feel assured

12   that he is not a flight risk.

13           The fact that he has ties to Nigeria, well, he's

14   Nigerian.  He's U.S. born, but he's Nigerian.  That should not

15   come as a shock that he has relatives outside of the country.

16   And he is not going.  His passports are now in possession of

17   the government.  They will remain in the possession of the

18   government.

19           I don't think that there is anything with this

20   packet, Judge, that would suggest that he is going to be a

21   flight risk.

22           Now, let me just check my notes, Judge.  I will also

23   add, Your Honor, that we are willing to ask the Court and

24   recommend to the Court that my client has no access to a

25   computer, that the computers in the home, that he will not be

41

1    given the password for those computers, and we have spoken to

2    Mr. Esi and his wife.  They understand that.  He will not have

3    a cell phone.  Any use of a phone will be that he has to use

4    the landline in the home.

5            So we're, we're mindful of the concern that the Court

6    might have on flight, and therefore, we put this package

7    together in advance.  We think it addresses any of these -- any

8    concerns the Court might have as to flight risk, Judge.

9            And let me check my notes and then check with learned

10   counsel, because I don't want to miss anything when I sit down,

11   Judge.  May I, Your Honor?

12           THE COURT:  Yes, sir.

13           MR. RAVENELL:  Thank you, Your Honor.  And I'll be

14   happy to address any question the Court has.

15           THE COURT:  Thank you.

16           Ms. Pedersen, why won't the conditions recommended by

17   the Pretrial Services officer augmented by the conditions that

18   Mr. Ravenell has suggested reasonably assure the defendant's

19   appearance as well as the safety of the community?

20           MS. PEDERSEN:  Your Honor, for the reasons that all

21   the facts and the reasonable inferences be drawn from them

22   point to the fact that the defendant has an incentive not to

23   reappear if released.  He has the means of a support system, a

24   network of people with whom he is, with whom he is close that

25   could support him if he decides not to reappear.

42

1            THE COURT:  Well, what evidence is before the Court
2   of that?
3            MS. PEDERSEN:  Well, what I'm saying is the
4   inferences to be drawn from that, Your Honor.
5            THE COURT:  All right.  Well, help me with the
6   inferences.
7            MS. PEDERSEN:  Well, the inferences is that the
8   Court -- are what the Court pointed out to you before.  The
9   inferences and the facts are the defendant has dual citizenship
10  in the U.S. and in Nigeria.  He has --
11           THE COURT:  All right.  Well, let's take things one
12  step at a time.  Does the government suggest that he has the
13  ability to obtain travel documents with which he could leave
14  the country?
15           MS. PEDERSEN:  Absolutely.  Anybody can obtain
16  falsified travel documents at any time.
17           THE COURT:  All right.
18           MS. PEDERSEN:  Any, any person could travel across
19  the border and get smuggled out.  We see those cases every day,
20  that people use false names, false documents, things that
21  are -- that appear real and pass for real documents.
22            To me, the biggest concern in this case --
23           THE COURT:  All right.  Does the government suggest
24  that he has the means to do that if he's on -- in home
25  detention with 24-hour GPS monitoring?

43

1          MS. PEDERSEN:  Absolutely.  If the defendant is in

2     custody, I would feel pretty guaranteed that he does not have

3     the ability to himself falsify or create any fraudulent

4     documents.  He doesn't have access to that.

5          There has been the creation -- during these -- this

6     conspiracy, Your Honor, coconspirators, including the

7     defendant's fiancee, have created false documents, including

8     W-2 wage reports, including statements of income --

9          THE COURT:  Well, I'm not trying to be cute,

10    Ms. Pedersen.  You or I could create a false W-2 in about 10

11    minutes on our computer.  We're talking about false travel

12    documents.

13         MS. PEDERSEN:  Absolutely.  Your Honor sees cases

14    every week in which people who want to come to this country

15    create false documents.  They take one that's been used before.

16    There are templates for those.  There are ways when people want

17    to travel, there are ways in which to do that, and people who

18    are sufficiently motivated are going to have the means

19    necessary.

20         Also, I mean, the use of fraudulent names just in his

21    everyday life, getting cell phones, bank accounts, the use of

22    false or fictitious entities, not telling people his true name

23    engaged in business -- none of the women that worked for him

24    knew his true legal name.  I mean, this is all designed to

25    conceal his true identity from people, because he was not

44

1    engaged in lawful activity.  When people are engaged in lawful

2    activity, they don't have the need to conceal their true

3    identity.

4           I think there is a very real concern that the Court

5    should have that he would flee and take any means necessary.

6    It's obviously a big deal for him.  He's marshalled a lot of

7    family support and friends to come here.  This is an important

8    day for him.

9           It shows to me and should show the Court how urgent

10   it is for him to be released.  It also shows the stakes are

11   high for him.

12          MR. RAVENELL:  Your Honor, I need to respond.

13          THE COURT:  Without suggesting that I've made up my

14   mind, because I haven't, I want to see title reports on the

15   four properties that Mr. Ravenell has indicated could be part

16   of a bond package, and I want affidavits or declarations more

17   appropriately from the record owners of those properties

18   establishing, A, that they're prepared to, to encumber the

19   properties as part of a bond package, and B, that there are no

20   liens or encumbrances not of record on, on the properties.

21          Mr. Ravenell, how long do you estimate it would take

22   you to get that?

23          MR. RAVENELL:  Your Honor, I would say that we should

24   have it to you within two to three days.  I have some

25   documentation on it, but I don't have, obviously, the

1  affidavits.

2         THE COURT:  I understand.

3         MR. RAVENELL:  All right.  Your Honor, may I just

4  check with Mr. Akuiyibo's brother whether that time period

5  works?

6         THE COURT:  Well, if it's -- the question is going to

7  be how quickly can you get title companies to give you title

8  for it.  It's not how quickly he's going to be willing to sign

9  a declaration.

10         MR. RAVENELL:  I understand.  I would suggest Your

11  Honor set it in three days.  If not, if we can't, I will -- we

12  can contact the Court to suggest that we need more time.

13         THE COURT:  All right.  Are counsel available Friday

14  afternoon at two o'clock?

15         MS. PEDERSEN:  The government is not available at

16  that time.

17         THE COURT:  All right.  When on Friday would you be

18  available, Ms. Pedersen?

19         MS. PEDERSEN:  I'm actually traveling out of town.

20  I'm going to be here for an hour in the morning, but I'm -- I'm

21  going to be out of town all day Friday.

22         THE COURT:  All right.

23         MR. RAVENELL:  Your Honor, I think we do have the

24  arraignment scheduled for this case at nine o'clock on Friday.

25         THE COURT:  Ms. Pedersen is not worried about the

46

1    arraignment.

2            MR. RAVENELL:  I understand.  I'm just saying we'll

3    be here.  I understand that.

4            THE COURT:  Ms. Pedersen is worried about me.

5            Thursday afternoon at three?

6            MR. RAVENELL:  I'm sorry; I apologize.

7            THE COURT:  Thursday at three?

8            MS. PEDERSEN:  That's fine with the government, Your

9    Honor.

10           MR. RAVENELL:  Yes, Judge.  We'll make it work.

11           THE COURT:  All right.  And if you don't have all

12   four title reports, just let me know.  I'll save you a trip,

13   and we'll move it to next week.

14           MR. RAVENELL:  We appreciate that.

15           THE COURT:  All right.  All right, the defendant is

16   remanded to the marshal's custody until further appearance, and

17   this hearing is continued until Thursday afternoon at three

18   o'clock.

19           MS. PEDERSEN:  Thank you, Your Honor.

20           THE COURT:  Thank you.  I believe that was the only

21   matter on the docket at two o'clock.  The Court is in recess.

22                            (Which were all the proceedings

23                             had at this time.)

24

25

47

1                    CERTIFICATE OF THE TRANSCRIBER

2        I certify that the foregoing is a correct transcript from

3   the official electronic sound recording of the proceedings in

4   the above-entitled matter.

5

6                                    _____
                                              /s/

7                                    Anneliese J. Thomson

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25