1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

UNITED STATES OF AMERICA     .    Criminal No. 1:12cr38-4
                           .
    vs.               .    Alexandria, Virginia
                           .    August 17, 2012
NASSIM TABATABAI,        .    9:40 a.m.
                           .
             Defendant.    .
                           .
. . . . . . . . . . .

TRANSCRIPT OF SENTENCING
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:         KIMBERLY R. PEDERSEN, AUSA
                          PATRICIA M. HAYNES, AUSA
                          United States Attorney's Office
                          2100 Jamieson Avenue
                          Alexandria, VA 22314

FOR THE DEFENDANT:          KOBIE FLOWERS, ESQ.
                          Flowers Law Firm
                          1750 K Street, N.W., Suite 200
                          Washington, D.C. 20006

OFFICIAL COURT REPORTER:    ANNELIESE J. THOMSON, RDR, CRR
                          U.S. District Court, Fifth Floor
                          401 Courthouse Square
                          Alexandria, VA 22314
                          (703)299-8595

(Pages 1 - 35)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

2

```
1                    P R O C E E D I N G S

2                      (Defendant present.)

3              THE CLERK:  Criminal Case 12-38, United States of

4    America v. Nassim Tabatabai.  Would counsel please note their

5    appearances for the record.

6              MS. PEDERSEN:  Good morning, Your Honor.  Kim

7    Pedersen and Patricia Haynes for the United States.

8              THE COURT:  Good morning.

9              MR. FLOWERS:  Good morning, Your Honor.  Kobie

10   Flowers on behalf of Dr. Nassim Tabatabai.  Chris Mead was

11   excused by the Court at the Court's last hearing.

12             THE COURT:  All right.  We have before us the

13   defendant's motion to withdraw plea, which was filed late

14   yesterday afternoon.  I appreciate the fact that the government

15   was able to respond to it, and we have read your response.

16             Mr. Flowers, is there anything you want to add to the

17   discussion in light of the government's response?

18             MR. FLOWERS:  Yes, Your Honor.

19             THE COURT:  All right, go ahead.

20             MR. FLOWERS:  I was able to review the government's

21   response.  I just received it when I arrived here today.  The

22   government's response is lacking in several areas that I want

23   to bring to the Court's attention.

24             First and just also so the Court understands kind of

25   the chronology here, the reason that we filed our response
```

3

1    yesterday was because we learned about the *Brady* issue on

2    August 9.  When we learned about the *Brady* issue, we alerted

3    the Court, we alerted the government, and it was the day before

4    sentencing.

5         On August 13, Monday of this week, Your Honor, I

6    received from the government 175 pages of additional discovery.

7    On August 15, I received 1,400 pages of additional discovery,

8    which I had to review and, quite frankly, I'm still in the

9    process of reviewing, and so that's why -- and that's the

10   timeline, and that's why this motion was filed just yesterday.

11        THE COURT:  Well, you know, you've got a huge problem

12   in this case besides the fact that the law is against you.  As

13   you know, the burden is on a defendant --

14        MR. FLOWERS:  That's right.

15        THE COURT:  -- who is moving to withdraw a guilty

16   plea, but the problem you have is that all the material which

17   you call *Brady* addresses issues that are irrelevant to any of

18   the elements of the offense to which your client pled guilty,

19   so how is that *Brady*?

20        How does that make any material difference, A, to the

21   advice you gave your client?  For example, she was indicted on,

22   I think, three counts, much more serious counts than the

23   structuring charge to which she pled, and the government gave

24   your client a huge break by letting her plead to the

25   structuring count, and for the purposes of the structuring

4

1    count, because I reread the statute this morning and made sure

2    that the elements were as I recalled them to be, there is no

3    requirement that the funds that are structured came from a

4    source.

5           That affects perhaps the sentencing, there's a

6    two-point enhancement for that which we can address down the

7    road, but it doesn't undercut the legitimacy of the plea in my,

8    in my view.

9           So I want you to explain to me because, you know, the

10   *Moore* factors, those six factors that the Fourth Circuit says

11   the Court must look at in determining whether or not a

12   defendant may withdraw a guilty plea, the second factor is

13   whether the defendant credibly asserts legal innocence, and

14   your client can't possibly on this record be declaring legal

15   innocence of the structuring charge.  So explain to me why we

16   need to go much further in this discussion.

17          MR. FLOWERS:  I appreciate Your Honor's question, and

18   here's the answer quite simply, Your Honor, is that the Court

19   is absolutely correct that everything that we've brought up has

20   nothing to do with the structuring.  In fact, the government in

21   their pleadings say exactly that.

22          Here's the issue:  Had we known all of the

23   information that we knew during plea negotiations, when I had

24   to advise my client, you know, are we going to go forward with

25   trial and looking at what trial looks like, or are we going to

1    accept this plea that the government has given us on April 27

2    is when they made the phone call, we never had a legitimate

3    discussion, I could not give her the information that she was

4    due under *Brady*.

5          The information that we've given to the Court doesn't

6    have anything to do with *Brady* for structuring but certainly

7    has to do with *Brady* with respect to the indictment when we

8    were trying to figure out do we want to go forward to trial

9    against this indictment or do we want to accept the

10   government's plea.

11         I think that the government's own actions show this

12   Court how important this information was that was suppressed.

13   The government did not delay once they learned from Kuraye

14   Akuiyibo how weak their case was, they called the very next day

15   to get rid of this case.

16         Prior to that, Your Honor, for four months, quite

17   frankly, I'd been in the government's office trying to work out

18   something separate from the indictment, and at every turn, I

19   was met with a no.  Then all of a sudden, like a bolt from the

20   blue, the government calls me on April 27 to say let's get rid

21   of the indictment.  Let's try to figure out another plea.

22         Now, had I known that now the government knows that

23   the Bentley was arguably -- or, I'm sorry, the Aston Martin was

24   bought with the funds from a Bentley and so those funds were

25   arguably clean, had I known on April 27, that is -- and again

6

1    the information was found out by the government on April 26 --

2    had I known that the lead defendant was involved and not only

3    did he have legitimate means, but he had $150,000 in cash, had

4    I known that the defendant -- so you've seen and I won't go

5    through kind of the long list of, of information that had I

6    known then on April 27 all this exculpatory information, we

7    wouldn't have gone forward.

8         And I brought to the Court's attention *United States*

9    *v. Moussaoui*, which the Court knows far better than I do, but

10   in that case, which is something that the government did not

11   deal with in their pleadings, in that case, Your Honor, the

12   question was was the plea voluntary, because the defendant did

13   not receive exculpatory information.

14        Now, the Fourth Circuit went into very extraneous

15   detail about why the plea was, in fact, voluntary, because the

16   defendant had received the exculpatory information despite the

17   defendant's claim.  So that deals with at least one of the

18   *Moore* factors again dealing with whether it was voluntary.

19   That's the first *Moore* factor.

20        Getting to the government -- or to the Court's

21   concern about whether there was legal innocence here, again we

22   cited for the Court the *Thompson-Riviere* case, which again the

23   government does not distinguish in its pleadings, and again in

24   that case, the Fourth Circuit goes ahead and overturns the

25   district court's decision not to allow the defendant out of the

7

1    motion to withdraw because in that case, the defendant was

2    legally innocent because he wasn't an illegal alien.

3              Now, why does that case apply to this case?  It

4    applies to this case because venue in this case cannot be

5    proved if it doesn't come out of -- let's put it this way:

6    This Court doesn't have venue here, because it happened in the

7    Southern District of New York; that is, the structuring happens

8    in the Southern District of New York.

9              THE COURT:  Yeah, but you know what does happen in

10   this district?  Isn't the application to the credit union in

11   this district?

12             MR. FLOWERS:  Yes, Your Honor.

13             THE COURT:  Isn't there a false statement that your

14   client's admitted to?  That's a 1014 violation.

15             MR. FLOWERS:  Well, we haven't admitted to, to any

16   false statements, Your Honor, for one; and the other issue here

17   and that's another issue in this case is that a lot of the

18   false statements that the government purports that we made were

19   done by Kuraye Akuiyibo.  He had access to my client's entire

20   identity, okay?

21             Now, there is an application that goes to the Apple

22   Federal Credit Union here in the Northern Virginia -- here in

23   Northern Virginia, but the problem is that doesn't impact the

24   elements for structuring, which happens up in Manhattan, New

25   York.

8

1          THE COURT:  If you look at paragraph 13 of the

2   statement of facts, it says, "On or about March 5, 2011, under

3   the direction of Akuiyibo, the defendant knowingly made a false

4   statement on her used automobile loan application to Apple

5   Federal Credit Union that her income was $17,750.83 per month."

6   That's a 1014 violation.

7          MR. FLOWERS:  Fair enough, Your Honor, and I stand

8   corrected.  You're absolutely right.

9          THE COURT:  That's a felony.

10          MR. FLOWERS:  That's right, Your Honor.  I stand

11   corrected, and I apologize about that, but it does say there,

12   too, that under the direction of Kuraye Akuiyibo, but the Court

13   is absolutely correct.

14          THE COURT:  Did knowingly.  So, I mean, here's the

15   point:  You've briefed the issue.  I've considered obviously

16   with some care, I went back through everything that we have in

17   this case, this is not like the *Moussaoui* case.  This is not

18   like a lot of the cases you cite, because the actual offense to

19   which your client pled guilty, the offense to which she pled

20   guilty is not touched by any of this information.

21          What the new information at best does is it might

22   have changed the mix that you as counsel had to consider in how

23   you advised your client, but the reality of it is your client

24   is in much better shape now than she would have been if she had

25   gone through the trial, because even if she'd been acquitted at

1    trial, there are these other clear violations occurring in this

2    jurisdiction which the government could have -- they chose

3    obviously not to -- pursued.

4            Under the *Moore* factors, I don't find there's

5    credible evidence that the plea was not knowing and voluntary.

6    The defendant is a highly educated woman.  She has a medical

7    degree.  She was No. 1 in her class at Howard.  She answered

8    all of the questions the Court asked her in the Rule 11

9    colloquy in a knowing and articulate fashion.  As I said

10   earlier, there's no credible assertion of legal innocence of

11   the offense to which she pled guilty.

12           Now, I do find in your favor there was no delay

13   between the plea and the motion.  I do find that the defendant

14   had close assistance of counsel, and I don't think that your

15   assistance was that marred by not having access to this

16   information.

17           Will the withdrawal of the guilty plea prejudice the

18   government?  I mean, not really.  You know, yes, the government

19   would have to put on a trial, but all these people are

20   cooperating.  All these defendants want Rule 35(b) motions down

21   the road.  I don't think other than having to just spend the

22   time putting the trial together would be that prejudicial.

23           Would withdrawal be inconvenient for the Court and

24   waste judicial resources?  Well, it certainly would to the

25   extent that we'd have to bring a jury in to hear a case that in

10

1    my view would not be necessary.

2           So there are six factors.  I think the first two are

3    the most serious.  They clearly work against the defendant.  So

4    I'm denying the motion for leave to withdraw the guilty plea,

5    and we'll go forward with the sentencing today.

6           And to shorten this process, I am going to take into

7    consideration in terms of the sentencing analysis your argument

8    as to this late-produced information, and so that I don't want

9    to waste anybody's time, I am going to reduce the offense level

10   from 10 to 8, because I'm going to not give a two-point

11   enhancement for knowledge that the money came from an illegal

12   source.

13          As I said last time, even though in my view a

14   reckless disregard of the truth would have been a proper jury

15   instruction if this issue had gone to trial and I have a hard

16   time believing that anybody in this day and age would not be

17   suspicious at the very least of the source of that kind of

18   cash, I'm going to give the defendant the benefit of the doubt

19   on that.

20          So I'm going to use an offense level 8.  With a

21   criminal history of I, that reduces the guideline range to zero

22   to six months.  Probation is available for a period of one to

23   five years.  Supervised release is available for one to three

24   years.  The fine range is reduced from $1,000 to $10,000, and

25   there's a $100 special assessment.  So those are the guidelines

11

1     within which the Court is going to be looking at this case.

2             And I assume, Mr. Flowers, that you have been able to

3     go through the pre-sentence report yourself and have gone over

4     it thoroughly with your client?

5             MR. FLOWERS:  Yes, I have, Your Honor.

6             THE COURT:  All right.  Are there any factual

7     corrections, changes, additions, or deletions you want made to

8     the report?

9             MR. FLOWERS:  Nothing that we haven't already stated

10    to the probation officer and to the Court, Your Honor.

11            THE COURT:  All right, that's fine.  Then I'll hear

12    from the government first.

13            MS. PEDERSEN:  Your Honor, in this case, the

14    government contends that some period of incarceration would be

15    appropriate for this defendant, and the reason for that is that

16    there would be just punishment to this defendant for the

17    offense conduct of money structuring and also for the other

18    relevant criminal conduct that the Court has alluded to.

19            The second reason is to give deterrence to other

20    similarly situated defendants who are also, like this

21    defendant, well educated, with a professional degree, who come

22    from an upper middle class background, that you simply cannot

23    structure large amounts of cash in bank accounts, that you

24    can't decide that you're not going to question the source of

25    these funds, and you can't simply put your head in the sand

12

1   when you are asked to do things that you may believe are

2   illegal, wrong, or just not right.

3           But most importantly, Your Honor, the government

4   contends in this case that a sentence of incarceration is

5   important to avoid unwanted disparities with two of the other

6   codefendants that this Court has already sentenced, one of whom

7   was defendant Kiana McKelvin that the Court sentenced a couple

8   of weeks ago to six months in the Bureau of Prisons.

9           As the Court recalls, Ms. McKelvin was a student and

10  an aerobics instructor and was a working girl at some point in

11  time.  She worked as the part-time scheduler for this escort

12  agency, and the Court sentenced her to six months.

13          The defendant Alafaka Opuiyo was also sentenced to 20

14  months.  Ms. Opuiyo was a full-time scheduler and day-to-day

15  manager of this operation.

16          Without the defendant's willingness to let her

17  boyfriend, the owner and operator of the escort service, use

18  her credit cards to pay for the interstate travel of numerous

19  prostitutes, to allow him to use her bank account to deposit

20  the cash proceeds so he could conceal the nature, source, and

21  ownership of the money, that allowed him to continue to

22  bankroll his operation.

23          She also profited immensely from the largesse of this

24  very well-off institution.  She was unemployed for at least two

25  years.  She declared no income of her own, yet she enjoyed the

13

1    cash without asking any questions and lived quite a high

2    lifestyle.  And if you look at the pre-sentence report, she's

3    got debts to credit card companies in the thousands of dollars,

4    to department stores, $10,000, $12,000.  I mean, the spending

5    is outrageous, and that continued, this continued her

6    lifestyle.

7            So she did receive a benefit from this criminal

8    activity.  She was basically living off the backs of other

9    women who were working hard as prostitutes, and to come in here

10   and say that she's a medical doctor and she shouldn't go to

11   jail because of that, she's not any different, Your Honor, from

12   the other defendants who were from more modest backgrounds, and

13   I ask the Court to consider both her role in facilitating this

14   long-running, illicit racketeering enterprise and consider the

15   appropriate sentence, and we ask that you impose a sentence of

16   incarceration.

17           THE COURT:  All right.  Mr. Flowers?

18           MR. FLOWERS:  Thank you, Your Honor.  To this point,

19   the government continues to give this Court, to give opposing

20   counsel information that by their own investigation is not

21   correct.  The Court has already ruled against us in our motion,

22   but part of that motion to withdraw the plea dealt with

23   Virginia Rule of Professional Responsibility 3.8(d), and in

24   that rule, the government is supposed to give over information

25   and evidence as soon as possible.

14

1          In this case, it certainly did not, and under the

2     *Moore* factors, one of the -- there's six factors, but one of --

3     the seventh factor is to consider other relevant information.

4     This is other relevant information, and today the government

5     gets here and says that there is a sentencing disparity between

6     Dr. Tabatabai and Ms. Opuiyo and Ms. McKelvin.

7          There's no sentencing disparity, Your Honor.  The

8     government knows in its own case Ms. McKelvin, Ms. Opuiyo were

9     there, knew about the prostitution because they answered the

10    phones and made appointments for the prostitutes and the johns.

11    Dr. Tabatabai didn't do anything of the sort.

12         There is direct evidence that goes to Ms. McKelvin

13    and goes to Ms. Opuiyo.  There's no direct evidence, there's no

14    direct evidence in this case that goes to Dr. Tabatabai.  The

15    government has admitted itself that this is a circumstantial

16    case, and that's why all of the information that we found out

17    on August 9 very much mattered.

18         That the defendant put her head in the sand, that was

19    the government's position just moments ago, if that were true,

20    Your Honor, then you'd have to say -- and I put this in the

21    sentencing memo -- that 28 other people who were family members

22    of Mr. Akuiyibo put their heads in the sand, too.

23         The Court was here and sentenced Mr. Akuiyibo to 51

24    months, and during that sentencing, Ekine Akuiyibo was in the,

25    in the audience.  Ekine Akuiyibo is Mr. Akuiyibo's brother,

1    older brother, essentially was his putative father when

2    Mr. Akuiyibo loses his father.  Ekine Akuiyibo practically

3    raised Mr. Akuiyibo for 30 years.

4        Ekine Akuiyibo has a Ph.D. from Stanford University

5    in Electronic Engineering.  Ekine Akuiyibo had -- in the

6    government's own case, the government has 302s which talked

7    about how Ekine Akuiyibo received thousands of dollars from

8    Kuraye Akuiyibo.  Ekine Akuiyibo wrote this Court in a

9    character letter and didn't know anything about the

10   prostitution.

11       The character letters that this Court -- and one of

12   the pleasures of practicing before this Court is that this

13   Court, unlike many others -- and I practice all over the

14   country -- this Court diligently works hard to go through

15   everything that is filed, so I know the Court has reviewed the

16   28 character letters of Mr. Akuiyibo, and those letters were

17   from doctors, lawyers, politicians, people of at least on paper

18   significant intelligence, and not one single one of those folks

19   said that they knew that Mr. Akuiyibo was engaged in

20   prostitution.

21       The other piece that the government doesn't tell the

22   Court but the government has information about is that the

23   government's lead cooperator in this case, Kobla Fiagbedzi,

24   F-i-a-b-e-d-g-z-i (sic), spoke to the government no less than

25   39 times, told the government that in January of 2011, that he

16

1    designed the Web site for Kuraye Akuiyibo, the Web site that

2    was used for his prostitution.  He designs that Web site in

3    early 2009.  He doesn't figure out until January of 2010 that

4    this is a prostitution business.

5         So again, you have people who have direct evidence, a

6    direct knowledge of this prostitution business, and they

7    themselves did not know.  The government doesn't bring that to

8    the Court, and quite frankly, it's a violation of 3.8(d),

9    because they never brought it to us until we just by chance

10   found out about it.

11        Now, the government also talks about my client's

12   spending habits.  The client -- the government says that, well,

13   you know, she lived off this person's largesse.  Again, the

14   government doesn't tell the full story.

15        The government knows that she has no job, but there

16   are other folks, obviously, that are able to pay for her

17   admittedly out-of-control spending, admittedly.  She has no

18   income; yet she runs up these credit -- we admit to that.  That

19   has -- really, it's not a crime, and it certainly doesn't go to

20   the structuring piece or the general piece about what may or

21   may not have happened with this prostitution business, a piece

22   that the Court is well aware we, we disagree with, and it

23   shouldn't be counted as relevant conduct.

24        A few other things that I want to go forward with

25   that the government did not address that make a sentencing --

1    and I want to be clear -- of probation and 100 hours of

2    community service, we've already done the money judgments and

3    the mental health treatment by virtue of what we've already

4    filed under seal, that there's no fine that should be

5    addressed.

6          I want to go through the -- if the Court is at a

7    place where we're at 8, I still believe -- and the government

8    didn't address this -- that the safe harbor provision of 2S1.3

9    also applies.  In that provision, the question is whether there

10   was a reckless disregard of the source of funds.

11         I think the government -- well, I don't think -- I

12   know the government's own information shows that Dr. Tabatabai

13   asked about the source of funds.  She was told by Kuraye

14   Akuiyibo that he was involved in stocks, that he had

15   connections to oil.  The government -- or the Court is aware of

16   why there's some significant corroboration about that.  The

17   Court is also aware that there's significant corroboration by

18   virtue of the character letters that were filed on behalf of

19   Mr. Akuiyibo.

20         The government does not neither in its instant filing

21   or in its filing for a sentencing memorandum deal with the *Abdi*

22   case, which we filed in our sentencing memorandum, and in that

23   case, the government concedes that the safe harbor -- and this

24   was this government, this U.S. Attorney's Office in the Eastern

25   District of Virginia -- conceded that those defendants who were

18

1    engaged in an illegal money transmittal business that the

2    government believed was linked to al Qaeda, they concede that

3    even though those defendants didn't even ask about the source

4    of the funds -- here Dr. Tabatabai asked -- they conceded that

5    there was no reckless disregard there.  The government does not

6    deal with that case.

7         The proceeds of -- also for safe harbor to apply, the

8    funds have to be shown that the proceeds were from lawful

9    activity.  The Court is already very well aware, I outlined 13

10   reasons why the proceeds came from lawful activity.  I used the

11   government's own case to, to prove that up.

12        Also, there is the *Ali* case, an unpublished opinion,

13   and it's dicta but it's still in the Fourth Circuit, in which

14   that -- in which the Fourth Circuit decided that we don't have

15   to prove that the specific, all of the specific funds were

16   engaged in illegal activity.

17        And then finally, the government does not address the

18   *Bove* case, *United States v. Bove*, which is dealt with in the

19   Fourth Circuit case of *Abdi* by Judge, Judge Motz, the *Bove* case

20   at 155 F.3d (2d Cir. 1988).  In that case, the safe harbor did

21   apply, and those funds everyone admitted were used ultimately

22   for a deal to hide taxes.

23        THE COURT:  All right.  Mr. Flowers, you've argued

24   the -- you've briefed the issue, and you've argued the issue.

25   I'm not giving the safe harbor adjustment here.  As I said, the

19

1    totality of the facts in my view, as I have said many times

2    before, regardless of all this new evidence, that amount of

3    cash is per se suspicious.  Nigerian oil scams are so well

4    known to the Court that someone who says they're getting their

5    money from Nigerian oil things, I'd at least take that with

6    several grains of salt before I would accept the argument that

7    that was legit.

8              MR. FLOWERS:  Very well, Your Honor.

9              THE COURT:  Let's move on.

10             MR. FLOWERS:  I'll move on.

11             And the question obviously is what did Dr. Tabatabai

12   know.  I have filed several sentencing memorandum.  One of them

13   is from a Mr. Walters (sic) in which he explains -- and several

14   other people explain, quite frankly -- that Dr. Tabatabai

15   doesn't have the street sense even of this Court, obviously,

16   and so when she's told that, look, this money comes from

17   Nigeria, when she goes to Mr. Akuiyibo's house and sees how

18   well appointed it is, when she sees him driving high-end cars

19   when she first meets him, when she goes to Nigeria with

20   Claudine Page and sees how Mr. Akuiyibo and his family are

21   connected to Nigerian oil, she believes in her mind that he's

22   aboveboard, that he's legitimate.

23             Now, look, the Court certainly has done this far

24   longer than I have and than the government, and we know that

25   those raise red flags, but for Dr. Tabatabai, they didn't.  She

20

1    doesn't have the experience that, that we have.

2         With respect to -- so that's one issue about her

3    history and characteristics that the Court should take into

4    consideration as it figures out what is a just sentence under

5    18 U.S.C. 3553(a)(1).  Also, the Court should take into

6    consideration that this woman resisted the structuring of the

7    funds, all right?

8         The Court has the letter from Natasha Abraham where

9    Natasha Abraham talks about the calls that she got from

10   Dr. Tabatabai about the pressure and the stress that this

11   person was putting on him.  The Court is well aware about how

12   some Nigerians and others engage in illegal conduct and how

13   they're able to take advantage of people.  That's what Kuraye

14   Akuiyibo did.  Natasha Abraham tells the Court that, also does

15   Mr. Walters (sic), who filed a letter with the Court.

16        The mental health piece, that's something that was

17   filed under seal, and I don't want to go into that in open

18   court, but that is also a piece that should affect this Court's

19   decision-making.

20        The community service, Dr. Tabatabai certainly has

21   taken responsibility for what she did and engaged in community

22   service by working up at the Iris Cantor Women's Health Center

23   at Cornell Medical School, helping with studies dealing with

24   mastectomies.  She's done a hundred hours of that.

25   Dr. Tousimis filed a letter about that.  So again, that should

1    be taken into consideration under 3553(a)(1).

2         With respect to 3553(a)(2), the seriousness of the

3    crime is an issue, and we certainly know that it's an issue.

4    We spoke to this government early on about her trying to keep

5    her medical license because of how serious this crime is.  The

6    government at every turn rejected that.  We asked the

7    government to allow her to plead to a structuring misdemeanor

8    given how serious this crime is.  The government rejected that.

9    So we certainly know how serious this crime is.

10        Dr. Tabatabai's actions by engaging in community

11   service, by following everything that this Court asked her to

12   do, demonstrates how serious this offense is.

13        And even the Supreme Court has said, "Probation is

14   not granted out of a spirit of leniency," *United States v.*

15   *Gall*, 552 U.S. 38 (2007).  So we're asking for probation,

16   recognizing that she has to walk forever in her life with the

17   ignominy of a felony conviction because of a bad relationship

18   and she's got a spending habit.

19        THE COURT:  All right.

20        MR. FLOWERS:  We recognize how serious it is, Your

21   Honor.

22        Incapacitation, the government asks for jail in this

23   case, recognizing that this is the only defendant in this case

24   where it, the case -- at least the prostitution case,

25   completely circumstantial.  You want to talk about disparity in

22

1  sentencing?  Jennifer Churchill received a $500 fine, but

2  Jennifer Churchill by the government's own investigation gave

3  photos -- or created photos, Photoshopped photos for the Web

4  site, and those photos listed the, quote-unquote, stats of

5  these women.  Those photos listed the sexual acts in which they

6  would engage.  She received a $500 fine for a crime that is not

7  even a misdemeanor.  It's a violation.

8          This woman will walk forever with a felony.

9          THE COURT:  All right, Mr. Flowers, I have several

10 matters I have to yet address.

11          MR. FLOWERS:  Very well, Your Honor.  And that, quite

12 frankly, concludes our argument, and obviously, if there's any

13 other follow-up questions, we'd be more than happen to respond.

14 I do know that Dr. Tabatabai would like to address the Court,

15 too.

16          THE COURT:  Of course.  All right, Dr. Tabatabai,

17 come up to the lectern.

18          THE DEFENDANT:  Your Honor, I'm really nervous.  Is

19 it okay if I read my allocution?

20          THE COURT:  Yes, of course.

21          THE DEFENDANT:  My very best friend, Natasha Abraham,

22 sent this card to me the day this event occurred.  She said,

23 "I'm strong because I've been weak.  I'm fearless because I've

24 been afraid.  I'm wise because I've been foolish."  These words

25 explain the very essence of where I am today.  Standing before

23

1    you, I'm filled with remorse and pleading for a second chance.

2           The day after my arrest, one of my dearest friends,

3    Ivory Hancock, said to me something that seemed very cruel at

4    the time but also very telling of where my life had been.  She

5    said, "I know this is terrible, Nassim, but understand that

6    this is the only way that you can get out."

7           How did I get here?  How did I get to a place where

8    such a tragic event, a federal indictment, could be my savior?

9    After years of enduring the horrible conditions in Iran as a

10   child, my family finally moved to Canada, and eventually we got

11   back to the D.C. area.  I remember being so happy to have

12   escaped.  I was now free to pursue an education.  Nothing could

13   stop me.  I felt empowered.

14          I excelled in academics and was thrilled to be able

15   to pursue my dream of becoming a doctor.  I studied day and

16   night and took advantage of every opportunity to excel.

17   Against of wishes of my father and my brother, who are

18   traditional Iranian men and also in medicine, I set on my

19   journey to become a breast surgeon.

20          I never took for granted the gift that this great

21   country gave me, which is the opportunity to pursue my dreams,

22   and that's why I am so full of remorse, shame, and sorrow, and

23   this is why I am so sorry.  I feel that in a way I've wasted

24   everything that I worked so hard for.

25          I've had a lot of time to think about everything that

1    occurred and how I ended up in this position, how I ended up

2    with Kuraye, and how I ended up committing a crime.  After

3    years of working towards the goal of becoming a physician and

4    the only woman surgeon in my program, I was suddenly physically

5    and emotionally unable to keep up with the rigors of the

6    program at Cornell.  The pain of my patients combined with

7    extremely long working hours took a toll on me.  I felt

8    helpless and overwhelmed.  It is of no surprise that when I

9    left my surgical training program, I fell apart.

10          It was approximately two weeks after moving out of my

11   hospital housing at Cornell in June of 2007 that I met Kuraye.

12   To call our relationship unhealthy would be an understatement.

13   He told me about his family, how poorly his father treated his

14   mother, and he'd never been in a relationship because he didn't

15   think he deserved to be loved.  Being the product of a torn

16   household as well, I made it my personal mission to show him

17   the power of love and family and what we could build together,

18   and I failed that mission.

19          As time passed, it seemed that no matter how much I

20   gave to him, he would take it and give nothing in return.  He'd

21   go weeks wanting to be away from me, telling me he needs to be

22   himself.  It wasn't long before I realized how toxic this was

23   for me and wanted to leave.  However, to my agony, it seemed

24   that the more I tried to separate myself, the more he pulled me

25   in.

25

1            Financially, he used all my credit.  I was and am

2       heavily in debt.  He had used up all my cards, all my accounts.

3       I let him have access, and I'm so wrong to do that, and I'm

4       sorry and ashamed.  He promised me for years he would pay off

5       all the debt he incurred on my credit, but he never did, and

6       despite what's been stated by the government, there were no

7       bags of money anywhere in my sight.

8            The purchase of this car that has ultimately led to

9       me having a felony conviction was perhaps one of our biggest

10      fights.  When I say fights, it was really him screaming so loud

11      so that I would give in, and I would pray that he would stop

12      before hurting me.  I didn't want to purchase this car, not

13      because I was suspicious of any dirty money but because I

14      didn't want to run after him for the car note every month.

15           Around that same time, I just started my first real

16      job in New York as a medical director, which is where I work

17      now, and I was gaining my independence and I was planning to

18      leave really soon, but sadly, I gave in to him and did what he

19      wanted, and I'm so sorry for that.  I should have been

20      stronger, and I should have found a way to fight back.

21           I promise you I never questioned the source or the

22      fact that it was cash.  I figured it was from his car business

23      in Nigeria.  I knew in Nigeria everybody dealt with cash

24      because the banks are so corrupt.

25           He always had legitimate income.  He told me he had

an MBA from NYU.  He had a Web design company, real estate
investments.  He had a restaurant in Dupont Circle that we used
to eat at when we first started dating, an oil business in
Nigeria.

I'm ashamed to say I trusted him.  I was wrong, and
I'm really, really sorry.  I was weak.  I should have had the
courage to say no.  I'm now forever a felon, and I'll never be
able to wash away that stain.

I thought I was in love and wanted to make it work.
I made every excuse for how he treated me.  It was like a
vicious cycle.  I promise you my honor I would never imagine
anyone such as myself in a relationship if I hadn't experienced
it myself.  It was disturbing.

I also want to assure you there's no way I would ever
stand by someone as a criminal.  My family has the strictest
morals and values.  My father jeopardized his whole family's
safety and lives by refusing to work with the Ayatollah regime
in Iran because he thought they were criminals.

Yes, I do have a spending problem.  I do like to
shop, like my sisters.  I'll be the first to admit I've never
been good with money, but I promise you I'm learning to save
and be fiscally responsible.  I have my first real job.  I can
actually pay all my bills now.

I believe that this country offered us freedom and
the chance to pursue our dreams, and I'm forever remorseful for

27

1    what I did.  I let everyone down.  I hope that you accept that

2    this crime is not a testament to my character.

3            I can genuinely say that my years with him were my

4    most shameful and darkest times.  When I left my training

5    program in surgery, I lost my spark, the dream that I fought

6    for for so long.  There was no textbook written to direct me

7    anymore.

8            In my years with him, I was weak.  I was foolish.  I

9    committed a crime and hurt everybody I care about.  I betrayed

10   my promise to be an asset to my family and my country, and I'm

11   sorry for that.  To this day, I've been unable to inform my

12   parents of my legal situation because I believe they will be

13   heartbroken.

14           I want to assure you as I stand before you I have

15   nothing to hide.  I am forever changed.  I promise to be

16   smarter.  As Maya Angelou once said, "History, despite its

17   wrenching pain, cannot be unlived, however, if faced with

18   courage, need not be lived again."

19           Thank you, Your Honor.

20           THE COURT:  All right.  Well, I've listened

21   carefully, Ms. Tabatabai, to what you have said.  Again, I went

22   through the pre-sentence report, your background -- stay at the

23   lectern, please.

24           THE DEFENDANT:  Okay.

25           THE COURT:  In your case, some period of

1    incarceration is appropriate, because you are an intelligent,

2    well-educated woman, and the crime, despite what you have said

3    about pressure from the codefendant, nevertheless, at your

4    level of maturity, you should have been able to withstand it,

5    and it is very important, particularly in crimes involving

6    pre-planning such as a structuring crime, that a clear message

7    be sent to not only the individual but as well as to the

8    community.  General deterrence is a legitimate and significant

9    factor particularly in these types of crimes.

10           For those reasons, the sentence of the Court is that

11   you be committed to the custody of the Bureau of Prisons for a

12   period of one month, that is, 30 days, to be followed by two

13   years of supervised release.  The terms and conditions of

14   supervision are first of all your uniform good behavior.  That

15   means you're not to violate any federal, state, or local laws

16   while on supervision.

17           Do you understand that?

18           THE DEFENDANT:  Yes, Your Honor.

19           THE COURT:  Secondly, you're to follow all the

20   conditions of supervision that will be printed on the judgment

21   order and explained to you by the Probation Office.  Do you

22   understand that?

23           THE DEFENDANT:  Yes, Your Honor.

24           THE COURT:  Now, there are several special

25   conditions.  The first is that you will then serve five months

29

1    in home detention with electronic monitoring for which you will

2    have to pay.  During that five-month period of home detention,

3    you are allowed out of your home only for the following

4    reasons:  to go to and from employment or to seek employment,

5    to meet with your probation officer and any and all counselors

6    that are part of your probation -- part of the probation

7    process.  You will also be permitted to leave your home to

8    participate in any bona fide religious observances and to

9    obtain any medical treatment for yourself.

10           Other than those reasons, you cannot be outside of

11   your home for any reason unless you've gotten permission in

12   advance from your probation officer.  Do you understand that?

13           THE DEFENDANT:  Yes, Your Honor.

14           THE COURT:  You are going to be required to

15   satisfactorily participate in such mental health counseling as

16   directed by the probation officer.  That could include the

17   taking of medication, inpatient or outpatient treatment,

18   whatever the medical professionals determine is appropriate,

19   and you must fully comply with those directions.

20           Do you understand that?

21           THE DEFENDANT:  Yes, Your Honor.

22           THE COURT:  You will have to pay the costs for the

23   mental health treatment and counseling.  Do you understand

24   that?

25           THE DEFENDANT:  Yes, Your Honor.

30

1          THE COURT:  The Court is also going to require that

2    you satisfactorily participate in a financial counseling

3    program as directed by the Probation Office since you

4    acknowledge and clearly the record indicates that you don't

5    have a good sense of personal finance and that that's something

6    that you need to get under control.  Again, you will have to

7    pay the costs of that financial program.

8          Do you understand that?

9          THE DEFENDANT:  Yes, Your Honor.

10          THE COURT:  You have to waive any privacy rights that

11    you have to the mental health treatment and counseling and the

12    financial counseling programs so that the Probation Office can

13    fully monitor your progress.  Do you understand that?

14          THE DEFENDANT:  Yes, Your Honor.

15          THE COURT:  The Court is going to also require that

16    you cannot engage in any financial transaction, that includes

17    purchases, taking out a line of credit, getting a loan, any

18    kind of financial activity involving $500 or more, without

19    getting permission in advance from your probation officer.  Do

20    you understand that?

21          THE DEFENDANT:  Yes, Your Honor.

22          THE COURT:  You have to waive any and all rights you

23    have to privacy as to your financial records so that the

24    Probation Office can monitor your employment, your tax returns,

25    your spending, etc.  Do you understand that?

31

 1          THE DEFENDANT:  Yes, Your Honor.

 2          THE COURT:  All right.  You will be required to

 3  notify any employer of your conviction.  Do you understand

 4  that?

 5          THE DEFENDANT:  Yes, Your Honor.

 6          THE COURT:  All right.  Now, in addition to that, I

 7  am finding that because of the costs of supervision that I have

 8  just imposed and again you're paying the costs of electronic

 9  monitoring, that you do not have sufficient resources to pay

10  the costs of incarceration or any further costs of supervision,

11  but I do find that you can pay the minimum fine in this case,

12  which is $1,000, and I'm going to require that that be paid

13  within the first year of supervision and that at a very

14  minimum, you'll be having to pay $100 per month towards that

15  $1,000 fine starting 30 days from your release from custody.

16          Do you understand that?

17          THE DEFENDANT:  Yes, Your Honor.

18          THE COURT:  All right.  There is no history of drug

19  abuse, so the mandatory drug testing is waived.  However, the

20  Probation Office can at any time demand a drug test from you,

21  and you must comply.  Do you understand that?

22          THE DEFENDANT:  Yes, Your Honor.

23          THE COURT:  And lastly, the Court does impose the

24  $100 special assessment, which should already have been paid if

25  it hasn't been.

32

1          Does the government object in any respect to

2     self-surrender?

3          MS. PEDERSEN:  No, we do not, Your Honor.

4          THE COURT:  All right.  I will allow you to

5     self-surrender, Ms. Tabatabai.  That means that you'll have a

6     few days or weeks to get your affairs in order before you start

7     the 30-day sentence.  I'm going to continue you on your current

8     bond, with the additional condition that when you are advised

9     by the marshal as to where you're to serve your 30-day sentence

10    or your one-month sentence, you will report to the facility

11    yourself.

12         Do you understand that?

13         THE DEFENDANT:  Yes, Your Honor.

14         THE COURT:  All right.  Is there anything further we

15    need to address?

16         MS. PEDERSEN:  No, Your Honor, thank you.

17         THE COURT:  Mr. Flowers, anything further you want

18    the Court to address?

19         MR. FLOWERS:  Two points, Your Honor:  If we decide

20    to file a motion to reconsider, when should we --

21         THE COURT:  Don't waste your time.

22         MR. FLOWERS:  All right.

23         THE COURT:  However, you do have a right to appeal

24    the Court's decision denying the right to withdraw the plea.

25    Any appeal must be noticed within 14 days of today's date, and,

33

1   Ms. Tabatabai, if you cannot afford counsel to handle the

2   appeal, we'll appoint one for you -- appoint an attorney for

3   you.

4              Do you understand that?

5              THE DEFENDANT:  Yes.

6              THE COURT:  All right.

7              MR. FLOWERS:  And then the last issue, Your Honor, is

8   we inadvertently filed our last pleading publicly.  We tried to

9   file it under seal, and we take responsibility for that.  It

10  wasn't filed under seal.

11             THE COURT:  Somebody from your office called chambers

12  far too many times yesterday.  You-all are -- if you practice

13  in this court or you have local counsel who practices, you're

14  expected to know how to file in the ECF system.  It's all out

15  there on the Web site.

16             But the bottom line is once you file something, it's

17  out there, and if there's a legitimate reason to have it filed

18  under seal, there needs to be a proper motion.  I've been

19  through this.  I actually wound up speaking to your intern last

20  night.

21             It's between you and the Clerk's Office in the court.

22  File the appropriate papers.  I have no idea what it is that

23  needed to be kept under seal.

24             MR. FLOWERS:  Very well.

25             THE COURT:  All right?

34

1          MR. FLOWERS:  Okay.  I just wanted to bring -- just

2     so the Court knows, first off, I apologize.  This was -- as you

3     know, I have local counsel in this case; it wasn't my office;

4     and so there was some miscommunication there; but I certainly

5     take responsibility for that; and I apologize to the Court for

6     that.

7          The other issue is in the last filing, there were

8     reference to 302s, which under the Court's protective order

9     were protected documents, and so that's why out of an abundance

10    of caution we tried to, obviously, file it under seal.  If the

11    Court -- you know, we will file another motion to have it

12    properly put under seal.

13         THE COURT:  Does the government have any concern with

14    that?

15         MS. PEDERSEN:  Yes, we do, Your Honor, and the

16    discovery was provided pursuant to a protective order, so that

17    information should not be disseminated publicly.

18         THE COURT:  All right.  Well, you-all have to work it

19    out, but as you know, once it's been docketed publicly, as this

20    was, it's there, and so sometimes I've often advised counsel

21    the motion to have it sealed or redacted draws more attention

22    to it than, than it would otherwise have gotten.  Plus, it's

23    not verbatim.  I think they're paraphrasing primarily.

24         MR. FLOWERS:  That's right, Your Honor.

25         THE COURT:  So I think you both need to think about

35

1    whether you need to do it, but if so, file the appropriate

2    motions, all right?

3              MS. PEDERSEN:  Thank you, Your Honor.

4              MR. FLOWERS:  Thank you, Your Honor.

5              THE COURT:  Now, Mr. Flowers, you need to take your

6    client to the Marshals Service today so they know she's going

7    to be a self-surrender.

8              MR. FLOWERS:  Very well, Your Honor.

9              THE COURT:  And then check in with Pretrial, because

10   the bond is being continued, and I believe our probation

11   officer is in court, and she can chat with you as well.

12             MR. FLOWERS:  Very well, Your Honor.  Thank you.

13             MS. PEDERSEN:  Thank you.

14             THE COURT:  All right.

15                            (Which were all the proceedings

16                             had at this time.)

17

18                  CERTIFICATE OF THE REPORTER

19      I certify that the foregoing is a correct transcript of

20   the record of proceedings in the above-entitled matter.

21

22

23                          _____
                                        /s/
                              Anneliese J. Thomson

24

25